SAN ANTONIO & A. P. RY. CO. et al. v. MILLER et al. †

(Court of Civil Appeals of Texas. San Antonio. April 26, 1911. On Motion for Rehearing, May 24, 1911.)

1. PLEADING (§ 261*) — CARRIAGE OF LIVE STOCK—AMENDMENTS.

In an action against a railroad for damages through delay in transporting plaintiff's cattle, where the original answer contained general demurrers and special exceptions, etc., and special answers to the effect that those in charge of the cattle did not request that the train be stopped in order to water and feed the stock, though ample facilities were offered, etc., an amended answer setting up numerous special exceptions not included in the original answer and special pleas alleging failure to comply with requirements of the contract, etc., and a failure to request in writing, as provided in the contract, opportunity to water and feed the stock, brought new issues into the case, and its filing was properly refused.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 794–800; Dec. Dig. § 261.*]

2. APPEAL AND ERROR (§ 959*)—PLEADING (§ 236*) — DISCRETION OF TRIAL COURT — AMENDMENT OF PLEADINGS.

Matters relating to an amendment of pleadings during a trial must be largely intrusted to the discretion of the trial judge, and, unless there is a palpable abuse of such discretion, appellate courts will not interfere with rulings thereon.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3825–3833; Dec. Dig. § 959;* Pleading, Cent. Dig. § 601; Dec. Dig. § 236.*]

3. WITNESSES (§ 37*)—COMPETENCY—KNOWLEDGE.

That a witness had been at a certain town only twice did not destroy the effect of his testimony as to the market value of cattle there,

since he might know such market value, though he had never visited the place.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 80; Dec. Dig. § 37.*]

4. JUDGMENT (§ 670*)—CONCLUSIVENESS—CAPACITY OF PARTY—COMMUNITY PROPERTY.

Executors of an estate had full authority to prosecute a suit for damages to community property regardless of who might be entitled to part of it, and a surviving wife suing as an executrix was bound by the judgment, not only as executrix, but as an individual.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1185; Dec. Dig. § 670.*]

5. TRIAL (§ 260*)—INSTRUCTIONS — INSTRUCTIONS COVERED.

The refusal of an instruction, the purport whereof was given in the main charge and in special charges, is not error.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 651; Dec. Dig. § 260.*]

6. TRIAL (§ 327*)—SUFFICIENCY OF VERDICT.

A verdict against railroads designated by initials and parts of words instead of the full names was a sufficient basis for a judgment against them.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 768½; Dec. Dig. § 327.*]

7. CARRIERS (§ 228*) — CARRIAGE OF LIVE STOCK—DELAY IN TRANSPORTATION—SUFFICIENCY OF EVIDENCE.

Evidence *held* insufficient to show that a delay in transportation of plaintiff's cattle was caused by negligence of defendant railroads.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 228.*]

Appeal from District Court, Bee County; E. A. Stevens, Judge.

Action by S. F. Miller and another against the San Antonio & Aransas Pass Railway Company and others. From the judgment, defendants appeal. Affirmed in part, and reversed in part and rendered.

See, also, 137 S. W. 1191.

A. C. Hamilton, for appellants. Dougherty & Dougherty and John De Berry Wheeler, for appellees.

FLY, J. Mrs. S. F. Miller, a feme sole, and D. B. Miller, executors of the will of S. G. Miller, deceased, sued the San Antonio & Aransas Pass Railway Company, the Texas Mexican Railway Company, the National Railroad Company of Mexico, and the Mexican International Railroad Company, alleging that in November, 1907, S. G. Miller ordered 13 cars, in which to ship cattle, from the San Antonio & Aransas Pass Railway Company; that the shipment was to be made on November 11, 1907, from Mathis, Tex., to Cacaria, in the state of Durango, republic of Mexico; that the agent of the railroad company named notified the shipper on the evening of November 11, 1907, that the cars would not be ready on that day, but would be ready at 6 o'clock a. m. on November 12th; that the said railroad company, as well as the Texas Mexican Railway, knew that it was important that the cattle should reach Laredo promptly, so that they might be crossed into Mexico before 6 o'clock p. m. on No-

vember 12, 1907; that said cars were not furnished on November 11th, and, although the cars were placed on the track at Mathis by 6 o'clock a. m. on November 12th, no engine was furnished to move the cars so they could be loaded until about 8:30 a. m., and, after the cattle were loaded, the cars did not reach Alice until about 9 o'clock p. m., although the distance was only 28 miles, and said delay caused many of the cattle to get down in the cars; that, after the cattle were delivered to the Texas Mexican Railway Company at Alice, they were held there so they did not reach Laredo until the morning of November 13th; that the cattle, after they reached Laredo and were delivered to the National Railroad Company of Mexico, were delayed on the way to Monterey; that appellee sought to ascertain how long the cattle would be held at Laredo so that he could feed and water the same, but was told by agents of the companies that they would soon move and deprived appellee thereby of the opportunity of feeding and watering the cattle; that the cattle were delayed at Monterey, Mex., where they were delivered to the Mexican International Railroad Company for transportion to their destination. It was alleged that each of the three last-named roads handled the cattle roughly and greatly delayed them, and no opportunity was given to feed or water the cattle; that, by reason thereof, the cattle became thin and sick, some died while in transit, and about 185 of them died after they reached their destination. It was alleged that appellee was damaged in the sum of $6,000 by the San Antonio & Aransas Pass Railway Company, in the sum of $5,100 by the Texas Mexican Railway Company, in the sum of $1,950 by the National Railway Company of Mexico, and in the sum of $1,950 by the International Railway Company. The following verdict was returned: "We, the jury, find for the plaintiffs, viz: The S. A. & A. P. R. R. $2,434.00, Texas Mex. R. R. $2,434.00, Mexican National R. R. $1,216.00, Mex.-International R. R. $1,216.00. This includes interest to date." Judgment was rendered in conformity with the verdict, and all parties have appealed, the San Antonio & Aransas Pass Railway Company having filed one record and the three other companies another, which is the record in this case, separate assignments having been filed in each record and separate briefs presented, necessitating separate opinions.

There was testimony to show that the value of the cattle killed while in transit and those that died immediately after reaching their destination were of greater value than the sums found by the jury. This suit was filed on July 1, 1909, and in February, 1910, each of these appellants filed an answer, and the cause was tried in that month resulting in a mistrial, and it was set down for a

hearing six months thereafter, namely, on September 19, 1910, at which time it was called for trial, and appellee and the San Antonio & Aransas Pass Railway Company announced ready for trial, but the other appellants asked leave to file an amended answer, which was not prepared at that time, and the court granted them until 2 o'clock p. m. to prepare the answer and submit it to appellee's attorneys on condition that said answer would not introduce new matter or create new issues, "and would not delay or interfere with the orderly and expeditious disposition of the business of the court and trial of the cause." When the answer was prepared and submitted at 2 o'clock p. m., the court held that new issues had been raised by it which were "calculated to delay the trial and interfere with the orderly and expeditious disposition of the business oɪ the court and the trial of this particular cause," and that it was calculated to surprise appellee, and the court would not permit the filing of the amendment.

[1] That refusal is the subject of complaint in the first and second assignments of error. We find that in the original answers filed by the three appellants, by whom this record was filed, were contained general demurrers, and special exceptions, general denials, and special answers to the effect that the persons in charge of the cattle did not request that the train be stopped in order to water and feed the cattle, although there were ample facilities offered for such feeding and watering, and that the cattle were prudently handled, and, if there was any delay, it was through the negligence of the shipper, that ample opportunity was afforded the shipper to feed and water the stock at Laredo and that he refused to do it, and that there was no unnecessary delay at Laredo or any other point. In the amended answer sought to be filed, there were numerous special exceptions to the petition, which were not included in the original answer, and special pleas setting up a failure upon the part of appellee to comply with requirements of the shipping contract, such as a failure to give notice in writing to the agent at point of destination, or to some general officer, or to the agent who signed the contract, of any losses, damages, or injuries sustained by appellee, and a failure to request in writing, as provided in the contract, the privilege and opportunity to water and feed the stock. It is clear, we think, that new issues were brought into the case by the last answer of appellants. The terms of the contract had not been set up before, nor offered as a defense to the action and appellants could not quietly sit by for six months, and then after the case had been called for a trial and an announcement of ready made by the plaintiff and a codefendant seek to file a pleading that would not only interpolate new issues, but probably cause a continuance and

seriously interfere with the business of the court.

[2] Matters relating to the amendment of pleadings during a trial must be largely intrusted to the discretion of the trial judge, and, unless there is a palpable abuse of such discretion, appellate courts will not interfere with rulings in connection therewith. Bailey v. Fly, 97 Tex. 425, 79 S. W. 299; Lipscomb v. Perry, 100 Tex. 122, 96 S. W. 1069. If the answer set up new issues, the court acted properly in not permitting it to be filed, and, if it did not set up new issues, appellants could prove their defenses under their original answers. So, on either hand, the assignments should not be sustained.

The third, fourth, fifth, sixth, seventh, and eighth assignments of error all refer to evidence as to the market value of cattle in Cacaria, Mex., if they had arrived there in proper condition. The first proposition under the six assignments of error is: "Where it does not appear that a witness had knowledge of the market value of the grade and class of cattle in question at the time and place in question, he is not qualified to testify as to market value." That is a good abstract proposition, but its value to appellants is destroyed by the very testimony of the witness quoted by them in their statement under the proposition to this effect: "I know what the reasonable market value of these cattle would have been at Cacaria, Mex., if they had arrived there in the condition they should have arrived if they had gone through and been treated with ordinary care. The reasonable market value would have been about $50 round. There was a market for these cattle at Cacaria at that time."

[3] The fact that one of the witnesses had been in Cacaria only twice before this cattle shipment would not destroy the effect of his testimony, for a witness might know the market value of cattle in a place that he had never visited. The witnesses testified that they knew the market value, and that formed a basis for their testimony as to such value. The two decisions cited were rendered in cases where there was no evidence of knowledge of the market value of live stock in certain places. Even if the evidence had been objectionable, it could not have injured appellants, because it was shown that 185 cattle died at Cacaria, and the evidence was uncontroverted and unobjected to that the ones that were alive were worth $40 each, and, if the dead ones would have been worth that had they survived, the amount would have been greater than the total sum found by the jury with the interest included. As to the dead cattle, their value, had they been alive, was proved without objection, and it was more than the amount found by the jury, and appellants have no cause for complaint.

The second proposition is: "The issue as to whether or not the cattle were transported

within a reasonable time was an issue to be passed upon and determined by the jury." And so it was determined. The questions as to the difference in market value of the cattle had they arrived in proper time and condition and that in which they arrived become of no importance in view of the value fixed on the cattle that were killed. That alone exceeded the whole amount of the verdict. The court gave a special charge covering the points presented in the special charge the rejection of which is complained of in the ninth assignment of error, and appellants have no reasonable ground of complaint. The special charge given denied a recovery if the shipper failed to water and feed the cattle at any point on the route, while the special charge refused confined the failure to Laredo. The one given was sufficient.

[4] The executors of the estate had full authority to prosecute the suit for the community property, regardless of who might be entitled to a part of it, and, when Mrs. Miller sued as executrix for damages belonging to the community estate, she was bound by the judgment not only as executrix, but as an individual. In the case of Fouche v. Harrison, 78 Ga. 359, 3 S. E. 330, it was contended that, when an executor sues as such, he commits himself to nothing in his personal and individual character, and the Supreme Court of Georgia held: "To this doctrine we are quite unable to assent. On the contrary, as we understand the law, an executor who files the bill in his representative capacity is a party thereto in his individual capacity also, if as an individual he has a manifest interest in the subject-matter of the bill. * * * Whoever heard that an executor has to make himself a party to his own bill in order to bind himself individually, or to give himself as creditor, legatee, or otherwise the fruits of the decree to the extent of his personal interest in the same? Is it possible to doubt that on the present bill it would be competent to decree the proper disposition to be made of the legacies, whether to pay them out on the claims of creditors, or to hold them free from such claims? And how could the executor as an individual either shun the burden or be shorn of the benefit of any rightful decree on that subject that might be rendered? Unless we are wholly unfit to be judges on such a plain question, we are at a loss to understand why it should be considered a question at all. That no direct authority upon it had been produced must be due alone to the fact that legal evolution had not progressed far enough to develop a needless precedent for a necessary conclusion." The authorities cited by appellants have no applicability whatever to this case. Undoubtedly Mrs. Miller and her coexecutor had the authority to take the place occupied by the deceased, S. G. Miller, in the suit, and could recover exactly what he could recover, and be bound by the judg-

ment as he would have been bound. He sued for damages, let it be admitted to the community estate of himself and wife, and, when she entered the suit as the executrix of his will, she occupied his place for all purposes of the suit. The distribution of the community estate for which she was suing was a matter for future determination, and is a matter with which appellants have no concern. When they have settled the judgment herein obtained, they will have settled all they owe the community estate of Mrs. Miller and her deceased husband. No court in Texas has held otherwise.

[5] The purport of the charge, the refusal of which is complained of in the eleventh assignment of error, was given in the main charge and in special charges requested by appellants, and the court did not err in rejecting the special charge.

[6] The different railroads were designated in the verdict by initials and parts of words, instead of the full names, and the verdict is assailed on that ground as not affording a sufficient basis for a judgment against the different railway companies. The case of Railway v. Hathaway, 75 Tex. 557, 12 S. W. 999, is cited by appellants as sustaining their position, but it does not, although it is stated in the case of Dodd v. Gaines, 82 Tex. 429, 18 S. W. 618, that the Supreme Court in the first-named case had held that "a verdict against the 'G. C. & S. F. Ry. Co.' is not sufficient to support a judgment against the Gulf, Colorado & Sante Fé Railway Company." Nothing of the kind was held in the case of Railway v. Hathaway, but the objection to the verdict was on an entirely different ground. It has been held by this court that verdicts similar in form to the one under consideration were sufficient. Railway v. Kingsbury, 25 S. W. 322; Railway v. Cardwell, 30 Tex. Civ. App. 164, 70 S. W. 103. In the last-named case, the verdict was against the "M. K. & T. Ry. Co.," and this court said: "The verdict should be fairly and reasonably construed with reference to the parties before the court. If this be done, there can be no doubt of the intention of the jury to find against appellant. The name sufficiently and unmistakably identifies appellant as the party to the proceeding against whom they found." A writ of error to the Supreme Court in that case was applied for and denied.

[7] The undisputed testimony offered by appellees themselves shows that after the cattle reached Alice, the terminus of the line of the San Antonio & Aransas Pass Railway Company, the initial carrier, about one hour was consumed in rebilling the cattle over the line of the Texas Mexican Railway Company, which extends from Alice to Laredo. H. D. Miller, who was with the cattle, testified that "there was no delay at Alice, except to fix necessary papers from Alice to Laredo. We made good time." D. B. Miller

testified that there was no unnecessary delay at Alice, and both of the witnesses named testified that the cattle were promptly and safely carried to Laredo, at which point the testimony showed that all connection of the Texas Mexican Railway Company with the cattle ceased; that railway company had obligated itself to safely and promptly transport the cattle from Alice to Laredo. It is admitted by appellees that this was done, and, when the cars containing the cattle were placed on the siding where they were received by the connecting carrier, it had fully complied with the terms of its contract. Its line terminated in Laredo, and it had no right or authority to transport the cattle any farther. Appellees say, "As shown by the testimony above quoted, the Texas Mexican Railway Company was clearly negligent in delaying the cattle at Laredo"; but we fail to find any evidence of negligence in the testimony referred to. It may be that the Texas Mexican Railway Company had been in the habit of carrying shipments of cattle over its lines to Laredo, across the river into Mexico, but the fact remains that it had only contracted with the shipper of these cattle to deliver them in Laredo, and it fully complied with that contract, and owed no duty of informing the parties accompanying the cattle of the hour when the cattle would leave Laredo. It did not delay them there, and cannot be held for the consequences of that delay. Its line ended at Laredo and its contract ended there. Not only does the testimony show that the Texas Mexican Railway Company had fully complied with its contract in delivering the cattle at Laredo, but the allegations in the petition show the same. It is alleged in the petition· "That said live stock were transported by defendant the San Antonio & Aransas Pass Railway Company to Alice, Tex., and were there delivered to defendant the Texas Mexican Railway Company, and by it accepted for transportation over its line of railway for a · reward which was thereafter to it duly paid from Alice, Tex., to Laredo, Tex.; that upon reaching Laredo, Tex., said live stock were delivered to the defendant, the Mexican National Railroad Company of Mexico, for transportation over its line of railway to Monterey, Mex." No duty devolved upon it to supply a special engine to transport the cattle across the Rio Grande off its own line. Ample facilities were furnished at Laredo for feeding and watering cattle, and there is not one word of testimony indicating that the shipper or his agents made any effort to feed or water the cattle, nor is there any testimony tending to show that there was any desire upon the part of those accompanying the cattle to feed or water them. On the other hand, the persons with the cattle swore that they did not desire to feed and water at Laredo, and that they so informed the agent of the railway companies. The evidence, which was uncontroverted, showed that the delay at Laredo until about 11 o'clock a. m. on November 13, 1907, was caused by the requirement of the legal authorities that the cattle should have the ticks taken off them and that they should be greased, and the other part of the delay was caused by the action of Mexican custom house officers. As soon as the officials completed their duties, the train on the National Railway left and made an excellent run to Monterey, the end of its line, where it delivered the cattle to the Mexican International Railroad Company. The whole of the evidence tends to show that the delay in Laredo was not caused by the negligence of either of the railway companies.

The only ground of negligence presented as to the Texas Mexican Railway Company and as to the National Railway Company of Mexico was delay, and the charge was not complained of by appellees, nor did they seek, through requested charges, to present any other phase of negligence. It follows that neither of the roads mentioned can be held liable for the failure to water and feed the cattle at Laredo, even though it could be held that the shippers were prevented from feeding and watering the cattle by the constant announcements by the railway companies that the cattle would soon be moved. That phase of the case was not presented to the jury, and appellees acquiesced in the failure to present it. If the two railroads mentioned were not guilty of delay, there is' nothing to sustain the verdict, and it must be set aside.

The liability of none of the roads for failure to furnish facilities for watering and feeding the cattle was presented to the jury, except that of the terminal line, the Mexican International Railroad Company, and the matter of delay was also presented as to that company. In deference to the verdict, we feel justified in finding that there was evidence sustaining the charge of negligence against the Mexican International Railroad Company in failing to furnish facilities for watering and feeding the cattle, and also in delay which damaged them in the sum found by the jury against that road.

We affirm the judgment as to the International Railroad Company, but reverse it as to the Texas Mexican Railway Company and the National Railway Company of Mexico, and here render judgment in their favor.

### On Motion for Rehearing.

The inspector required the cattle to be oiled for ticks in Laredo, which, together with the inspection, consumed the time from early morning until between 10 and 11 o'clock, according to the testimony of D. B. Miller, who, however, stated in another part of his testimony that his brother E. E. Miller left Laredo on a passenger train, and that he left about 1 o'clock p. m., "as soon as they got

through inspecting the cattle." He swore that he talked with an agent of the railroads at the joint depot, and further testified: "It is a fact that the man I have mentioned did tell me they couldn't move the train over because the Mexican officials hadn't completed their papers; said they had to have the papers fixed." He further testified that they were not delayed in Nueva Laredo. There was absolutely no contradiction of the statement made by the agent to D. B. Miller as to the cause of the delay being the action of the Mexican officials.

D. B. Miller swore that he told the agent that he did not want to feed and water the cattle at Laredo, and H. D. Miller testified: "We could have watered the cattle at Laredo had we desired, but, instead of that, we wanted to hurry off to Monterey, expecting to water there." No effort was made to water the cattle in Monterey. H. D. Miller also testified: "The delay was to fix up our contract. My brother went over to see the Mexican officials about passing the animals, but I could not say why he did not make out the papers then. I think he had to go across the river into Mexico to get these papers. That is the place where we made out the contract afterwards. * * * The men came down to the switch and took the numbers of the cars and everything, the inspectors, I presume it was. They were men in the employ of the Mexican government. When we did leave, after the Mexican government was through with their inspection, we made fairly good time to Monterey." This witness contradicted his brother, D. B. Miller, and swore that E. E. Miller left Laredo after the cattle had gone, and he thinks passed them on the road. He testified that he saw him at 5 p. m. in Laredo. There was not one word of testimony tending to show that the cattle were delayed after the Mexican officials gave clearance papers. It was proved that the cattle could not be carried across the river until the Mexican officials sent over the papers to Laredo, and that it was the case that at times twelve hours would be consumed by the Mexicans in making out papers, even in the case of small shipments. The Mexican inspector swore that the inspection and execution of the custom house papers usually took until about 4:30 o'clock p. m.

H. D. Miller swore that the cattle were placed on a track which was the beginning of the Mexican National Railroad by the Texas Mexican Railway Company, and it thereby had severed its connection with the cattle, and was not responsible for any delay.

The motion for rehearing is overruled.