SAN ANTONIO & A. P. RY. CO. et al. v. MILLER et al. †

(Court of Civil Appeals of Texas. San Antonio. April 26, 1911. On Motion for Rehearing, May 24, 1911.)

1. CARRIERS (§ 228*) — CARRIAGE OF LIVE STOCK—NEGLIGENCE—SUFFICIENCY OF EVIDENCE.

Evidence *held* insufficient to support a finding that the failure to unload and water plaintiff's shipment of cattle at a certain point was due to delay by defendant railroad.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 228.*]

2. CARRIERS (§ 228*) — CARRIAGE OF LIVE STOCK — NEGLIGENT DELAY — SUFFICIENCY OF EVIDENCE.

In a shipper's action against a railroad for damages to cattle through negligent delay in transportation, evidence *held* to show that the delay on defendant's line did not cause the cattle to be on the road any longer than they would have been had the delay not occurred.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 228.*]

Appeal from District Court, Bee County; E. A. Stevens, Judge.

Action by S. F. Miller and another against the San Antonio & Aransas Pass Railway Company and others. From the judgment, defendants appeal. Reversed, and judgment rendered.

Proctor, Vandenberge, Crain & Lewright, for appellants. Dougherty & Dougherty and John De Berry Wheeler, for appellees.

JAMES, C. J. This action arises from a shipment of cattle from Mathis, Tex., on the line of the San Antonio & Aransas Pass Railway Company, to Cacaria, Mex., and was brought against the San Antonio & Aransas Pass Railway Company, the line of which terminated at Alice, Tex., and its connecting and succeeding carriers, the Texas Mexican Railroad Company, the National Railroad Company of Mexico, and the Mexican International Railroad Company. The plaintiffs Mrs. S. F. Miller and D. B. Miller sued as the independent executors of the will of S. G. Miller, the shipper, and alleged a separate case of liability as to each of the defendants for damages to the cattle in transit, praying for judgment against the San Antonio & Aransas Pass Railway Company in the sum of $6,000, from the Texas Mexican $5,100, and from each of the others the sum of $1,950. The result of the trial was a verdict against the San Antonio & Aransas Pass Railway Company for $2,434, the Texas Mexican Railroad for $2,434, the Mexican National Railroad for $1,216, and the Mexican International Railroad for $1,216. This opinion will deal with the appeal of the San Antonio & Aransas Pass Railway Company, and a separate opinion by Mr. Justice Fly will be devoted to the appeals of the other defendants. 137 S. W. 1194.

The petition charges to the San Antonio & Aransas Pass Railway Company negligent delay in the transportation of the cattle in the short trip on its line from Mathis to Alice, a distance of about 28 miles, which caused the shipment to arrive at Laredo at about 4 o'clock of the morning of the 13th of November, when otherwise it would have reached Laredo at 6 p. m. the 12th, and that this delayed the shipment across the border into Mexico. The petition alleged that (about 6 o'clock) after the cattle arrived at Laredo the agents of S. G. Miller went to inquire of the agents of the defendants the Texas Mexican Railway Company and the National Railroad Company of Mexico how long the stock would be kept in Laredo, in order to feed and water same, and the agents negligently and falsely advised that said train would move out and transport the cattle over the border much earlier than they were actually started, thus leaving the said Miller's agent in charge of the cattle momentarily expecting the cattle to be moved, and they were thereby deprived of an opportunity to water them; that finally, about 5 o'clock p. m. of the 13th, they were started ed in the custody of the National Railroad of Mexico; that they were delayed en route to Monterey, where they were delivered to defendant the Mexican International Railroad Company for transportation to destination; and that by each of the last-named companies the transportation was greatly delayed, and no opportunity or facilities or proper or sufficient pens to feed and water the stock was furnished by them, and each and all of the defendants roughly handled the stock en route, and that, by reason of said acts of negligence of the defendants and each of them, the cattle were greatly damaged, etc. There was an allegation that, by reason of the delay between Mathis and Alice, the cattle began to get down in the cars. The petition seeks to make the San Antonio & Aransas Pass Railway Company liable for damages resulting to the shipment while in transit to destination from the delays that occurred on its line.

The answer of the San Antonio & Aransas Pass Railway Company pleaded general de-

———

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

† Writ of error granted by Supreme Court.

nial; that by the contract of shipment it was not in any manner liable for any injuries or damages which were caused or resulted to said cattle after same had left its line of road; that it delivered the cattle within a reasonable time to its next connecting carrier, the Texas Mexican Railway Company, and that, if said cattle were injured or damaged in transit, same occurred after they had left the possession of this defendant, and, if any such damages or injuries were caused said cattle, that by virtue of the terms of said contract this defendant is in no manner liable or responsible therefor.

With reference to the San Antonio & Aransas Pass Railway Company, the court charged the jury to find for plaintiffs, if they believed that it delayed the stock as alleged, and in doing so it was negligent, and that plaintiffs' cattle were injured thereby as alleged. And to find for this defendant if there was no delay, or that the delay was not negligent, or that such delay did not cause injury to plaintiffs' cattle. The court further submitted this branch of the case by giving the following special and explanatory instructions asked by the San Antonio & Aransas Pass Railway Company: "You are instructed that defendant the San Antonio & Aransas Pass Railway Company is not responsible in this case for the length of time the cattle remained at Laredo, nor for the causes which may have caused same to remain there, nor is it liable for the fact that said cattle may not have been fed or watered or rested at Laredo, or after said cattle left Laredo en route to their destination, nor for any delays, or improper handling, if any there was, after such cattle were received by or were in the possession of either the Texas Mexican Railway Company, or the Mexican National Railway Company of Mexico, or the Mexican International Railway Company." Also the following: "At request of counsel for the San Antonio & Aransas Pass Railway Company, you are instructed that in no event can plaintiffs recover herein against said defendant, even if its servants and agents were guilty of negligence in the handling of the cattle in question, unless such negligence, if any, proximately and directly contributed to and helped to bring about the alleged losses and damages of which plaintiffs complain herein."

[1] The first assignment of error of this appellant is that the verdict against it is unsupported by any evidence, and undertakes to state at considerable length what is the uncontradicted evidence, as showing conclusively that the acts of this defendant, complained of as negligent, in no manner contributed to or caused the injuries or damage complained of.

As conclusions of fact, from the testimony, we find as follows: There was negligence shown on the part of this appellant in delaying the carriage of the cattle from Mathis to Alice about 10 hours beyond what was rea-sonably necessary. The run from Alice to Laredo was made in the usual time. The direct result of the above negligence of this appellant was that the shipment reached Laredo between 3 and 4 a. m. of November 13th, when otherwise they would have reached that point about 6 p. m. of the 12th. It was shown that, had they arrived in Laredo at 6 p. m. of the 12th, they would nevertheless have been obliged to stay there all night and a considerable part of the following morning, owing to the fact that the Mexican custom house closed before that hour, to wit, at 4 p. m., and did not open for business again until the next morning at 8:30 o'clock, and necessary papers had to be obtained from those authorities before the cattle could go beyond the border. Besides, these cattle had to be inspected by quarantine officers and treated for ticks before they would be admitted into Mexico, but this it seems might have been attended to that night in time for the cattle to have been permitted to leave the next morning, say between 9 and 10 a. m. But, when the cattle arrived at about 4 o'clock the next morning, the shippers, it appears, were led to believe by the agent early that morning at 6 o'clock that the train would move out with the cattle about 10:30 or 11 o'clock, and, when the train did not do so at that hour, the agent then said it would be at 1 o'clock, and at 1 o'clock, when it did not come, he stated it would come right away, but, in fact, it did not come until between 4 and 5 o'clock. It seems that these statements of the agent kept those in charge of the cattle from watering them on account of their belief, from what the agent told them, that the cattle were not going to be detained there any great length of time, enough to require watering them.

It appears clearly that the shippers had no intention or desire to water the cattle at Laredo, and that their intention was to stop at Monterey for that purpose, a distance of seven hours run from Laredo. Their purpose to not water at Laredo, if it could possibly be avoided, is clear. When the shippers went to the agent at 6 o'clock in the morning of the 13th, their purpose and intention are shown as follows: D. B. Miller testified that, when he went to see the agent about when the train would pull out from Laredo, he told him that, if they were going to be there any length of time, they wanted to feed and water the cattle; they had been on the cars for over 20 hours. "We would have watered them at Laredo if we had known we would stay there that long." This shows that at that time, at some time on the morning of the 13th, when the cattle had been on the cars without water over 20 hours, they would have watered them if they had known positively that the cattle were to remain there until 4 or 5 o'clock in the afternoon. This, however, is no evidence that if the cattle had reached Laredo at 6 o'clock the previous evening, when they would have been out

about 12 hours less, the owners would have taken steps to water the cattle there during the night. It is true that, if the cattle had reached Laredo at 6 o'clock p. m. on the 12th, the shippers would have known with certainty that the cattle could not be in shape to cross until some time next morning, and they could have unloaded the cattle that night. But there is no testimony that they would have done so, unless it is to be inferred from the fact that the next morning, 12 hours later, they would have done so, if the cattle were not to be moved for a considerable time after that. We think this would be a mere supposition. The fact that their settled purpose was to push on to Monterey without watering at Laredo, and that they were anxious even the next morning to push on without watering there, negatives the idea that they would have unloaded and watered the cattle the night of the 12th, while they would have been expecting to get off to Monterey early the next forenoon. We conclude, therefore, that the evidence was insufficient to warrant a finding that the failure of the cattle to be unloaded and watered at Laredo was due in any manner to the delay charged to this appellant.

[2] For some reason, probably this one, the trial judge charged the jury that this defendant was not liable for the failure to feed, water, and rest the cattle at Laredo. Another alleged result of the delay on appellant's line is embodied in the testimony of H. D. Miller as follows: "At Reynolds Switch (on appellant's line) the cattle began getting down, because they were wet and cold. It was night, and they were in hard shape. They were stiff then from standing on the cars so long." D. B. Miller testified: "Whenever you leave cattle standing that way, some of them get down. While standing there at Reynolds Station, we lifted up four or five head." The testimony concerning the condition of the cattle while at Laredo shows without dispute that they completely recovered from such effects, if any, as all of them were standing and in good shipping condition, all the time they were at Laredo, and there is no evidence of any of them getting down again after leaving Reynolds until near Monterey. It is evident that, if the cattle were really in an injured condition which caused them to begin to get down, that condition would have continued to show itself, but the testimony of the condition of the cattle during all the time they were in Laredo and beyond almost as far as Monterey shows clearly that the lying down of a few of the cattle at Reynolds Junction amounted to nothing in the way of injury. Another proximate result which seems to be claimed by appellee is that the 10 hours delay on this appellant's line caused the cattle to be on the trip to Cacaria that much longer than they otherwise would have been. The testimony negatives this. Let us suppose that there had been no delay on this appellant's line, and the cattle had reached Laredo at about 6 p. m. of the 12th. This was after the Mexican custom house was closed for business for the day, and the cattle necessarily would have had to remain in Laredo until after it opened the next morning, which was at 8:30 o'clock, and until the necessary papers could be perfected. The plain consequence of this would have been that the conditions which that morning and afternoon occurred and operated to prevent the cattle from being moved out until 5 o'clock in the afternoon, whatever they were, would have operated to delay the cattle just the same even if they had reached Laredo the preceding evening. There is nothing to indicate that they would have gotten out of Laredo any sooner than they did. Therefore we conclude that the delay which occurred on this appellant's line did not cause the cattle to be on the road any longer than they would have been, had the delay not occurred on its line.

The testimony we think shows conclusively that the injured condition of the cattle at destination was not attributable to what occurred to the cattle on this appellant's line, but to causes which originated after the cattle left its line, and for which appellant is not responsible. In fact, the court so charged the jury that this appellant was not responsible for the length of time the cattle remained at Laredo, nor for the causes which may have caused them to remain there, nor for the fact that they were not fed or watered at Laredo, etc. See the special charge above copied.

The conclusions which we have stated from the evidence show that what happened to the cattle while they were in appellant's custody cannot be considered as the proximate cause of the injuries which these cattle sustained.

It would have been proper to direct a verdict for this appellant, and therefore we think it is unnecessary to discuss the other assignments of error. The judgment will be reversed and judgment rendered here in favor of the San Antonio & Aransas Pass Railway Company.

### On Motion for Rehearing.

There is one part of this motion which seems to require explanation. The third ground of the motion is that this court erred in finding that, had the cattle not been delayed by the San Antonio & Aransas Pass Railway Company, they nevertheless would not have left Laredo sooner than they did, and in time for action by the customs authorities that evening. The contention of the motion is that if the loading of the cattle at Mathis had begun at 6 a. m. on the 12th as would have been done but for the negligence of the San Antonio & Aransas Pass Railway Company in furnishing an engine with which to load the cars, and the cattle had been transported with reasonable dispatch after

loading, they would have reached Laredo between 3:30 and 4 o'clock p. m. of that day, and before the custom house closed for the day; "said custom house closing at 4 p. m. Mexican time which was 4:36 American time." The testimony by the Millers shows that they thought the custom house closed at 6 p. m., and expected the cattle to get to Laredo before that hour. Let us see what the testimony shows with reference to what hour the cattle should have arrived at Laredo, if the engine had been on hand at 6 a. m. of the 12th at Mathis to enable the loading of the cattle to begin at that hour. D. B. Miller testified: "We commenced loading about 8 o'clock." It required 2½ hours to load the cattle which would have enabled them to be started at 8:30 o'clock, leaving out of account that some delay was necessary after loading in order to start the train. As to the usual time required to make the trip from Mathis to Alice the testimony is as the motion cites it. D. B. Miller testified: "It is about 28 miles from Mathis to Alice. The ordinary schedule time between Mathis and Alice is about 1½ or 2 hours." H. D. Miller, however, testified that it was something over an hour. According to this, a trip of over an hour did not involve unreasonable delay. The cattle then should have reached Alice at the earliest at 9:30 o'clock. The motion then cites the testimony of E. J. Schonbohm, agent at Alice for the Texas Mexican Railway. This witness testified: "In this particular case there were no additional contracts or anything to be made, and it wouldn't necessarily take us so long, as I see by the papers here it took them an hour to get the first train out and an hour and twenty minutes to get the second train out. That is fair time. It takes from forty minutes to an hour and a half for a train like that." D. B. Miller testified: "We arrived at Alice, * * * and it took an hour to make out the papers and bill these cars, something like that." H. D. Miller testified: "We were at Alice about an hour. During that time the agent and myself were engaged in fixing the papers for the trip. Just as soon as the necessary papers were made out, the train went." According to the evidence, an hour's delay or even more at Alice was not an unreasonable delay. This at one hour would put the leaving time from Alice at 10:30. The testimony of D. B. Miller was: "We got to Laredo between 3 and 4 o'clock next morning. * * * We arrived at Laredo about 4 o'clock in the morning. * * * We left Alice about 9 o'clock at night, and got to Laredo about 4 the next morning." H. D. Miller testified: "My recollection is that we arrived at Laredo between 2 and 3 o'clock." The testimony shows that the cattle left Alice at 9 o'clock and taking 3 o'clock as the time of arrival at Laredo, although D. B. Miller says about 4 o'clock, we

have the run from Alice to Laredo as six hours. The testimony shows that the run between these points was good time.

The testimony taken most favorable to appellees therefore shows that if loading had begun at Alice at 6 a. m., and the loading finished at 8:30, the train could not have reached Alice until 9:30, nor left Alice before 10:30. Adding six hours to this for the run from Alice to Laredo would have put the cattle there at 4:30 p. m. at the time the Mexican custom house closed for business for the day. The above does not take into account some necessary delay at Mathis after loading the cattle in order to start the train, nor the testimony of Schonbohm that it took an hour at Alice to get out the first train and an hour and twenty minutes to get the second train out, and that is fair time; nor the testimony showing that something more than an hour was required to make the trip from Mathis to Alice. The above shows conclusively that the cattle could not, with ordinary dispatch, have reached Laredo before the closing time of the custom house.

The motion is overruled.